1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| DAVID M. LAWRENCE, | ) | 1:09-CV-01008-GSA |
| | ) | |
| | ) | |
| | ) | ORDER REGARDING PLAINTIFF'S |
| Plaintiff, | ) | SOCIAL SECURITY COMPLAINT |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## **BACKGROUND**

Plaintiff David M. Lawrence ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability insurance benefits pursuant to Title II of the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Gary S. Austin, United States Magistrate Judge.[1]

//

//

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  *See* Docs. 8 & 9.

## FACTS AND PRIOR PROCEEDINGS[2]

Plaintiff filed his application on or about February 16, 2006, alleging disability beginning January 9, 2005.  AR 117-119.  His application was denied initially (AR 91-95) and on reconsideration (AR 97-101).  Thereafter, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 104.  ALJ Bert C. Hoffman, Jr., held a hearing on October 22, 2008. (AR 22-70), and issued an order denying benefits on February 3, 2009.  AR 8-21.  Plaintiff requested a review of the decision (AR 5-7) and on April 10, 2009, the Appeals Council denied review.  AR 1-4.

### Hearing Testimony

ALJ Hoffman held a hearing on October 22, 2008, in Fresno, California.  Plaintiff appeared and testified.  He was represented by attorney Melissa Proudian.  AR 22-70.

Plaintiff was born in Selma, California, on July 16, 1957.  AR 25.  He was 51 years old on the date of the hearing.  *Id*.  He is five feet, six and one-half inches tall.  *Id*.  He weighs about 200 pounds.  *Id*.  His normal weight is about 170 pounds, which he last weighed about one to one and one-half years ago.  AR 25-26.  He thinks the weight gain is due to the medications, but he does not know which one.  AR 26.  He completed the twelfth grade and attended about one year of junior college.  AR 29-30.  He also had vocational training at General Motors and Suzuki of America.  AR 30.  His last vocational training was in 2004.  *Id*.  He is right-handed.  AR 26, 69.

Plaintiff lives in Chowchilla, California.  AR 27.  He is not married, but has a 28-year old son who lives in Iowa and a 27-year old daughter who lives in Madera.  AR 26-27.  He has a girlfriend, but she does not live with him.  AR 54.  His parents, both 74 years old, live in Chowchilla and they come by to check on him almost every day.  AR 44, 56.  They go out for breakfast two to three times per week.  AR 56.  His brother and sister also live in Chowchilla. AR 57.  His best friend moved to Arkansas and they do not keep in contact.  AR 57.

For fun, Plaintiff plays on his computer and tries to do some things around the house.  AR 54.  He has a valid California driver's license and drives three days per week, but "hardly ever

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

go[es] out of Chowchilla." AR 28.  He has limited his driving because the reduced range of motion in his neck makes it difficult for him to look around, and he does not want to injure his neck. AR 28, 43.  He also limits his driving because of his depression medication.  AR 28.  He drives in the evenings because there are fewer people.  *Id*.  However, he does drive to his doctor's appointments in Fresno.  *Id*.  The last time he left the San Joaquin Valley area was about two weeks ago.  AR 28-29.  He went to Laughlin and Las Vegas for four days with his parents and his sister.  AR 28-29, 44.  His father drove and Plaintiff sat in the back seat.  AR 44.  They stopped every hour to get out and stretch.  *Id*.  The last time he left the United States was two years ago.  AR 55-56.  His parents took him on a cruise to Mexico and Guatemala.  AR 56.  There have been no other out-of-town trips in the last two years.  AR 56.

The last time Plaintiff worked was for almost three months between May and August, 2008.  AR 30, 34.  He worked as a service writer for John Deere in Madera.  AR 30-31.  He did clerical work because he could no longer do physical work.  AR 31.  He got that job by submitting an application and interviewing with the service manager and the owner.  AR 31-32.  He worked 40 hours per week plus some overtime.  AR 34.  He had difficulty sustaining the hours and it affected his ability to do the job.  AR 34-35.  He was "mentally beat" after about three days.  AR 34.  He was incapable of doing everything asked of him and had a problem interacting with people.  AR 32.  The owner's sister, who was in charge of transportation, harassed him while he worked there.  AR 32-33.  This kept him from doing his job, which he was having trouble doing anyway.  *Id*.  Plaintiff and his manager mutually agreed that his employment should be terminated.  *Id*.  He has filled out some job applications since he stopped working at John Deere.  AR 33.

For about one month in January, 2005, Plaintiff worked as a temporary night janitor at Chowchilla High School.  AR 36.  He got the job by submitting an application in response to a newspaper advertisement.  *Id*.  He worked from 4:30pm until midnight.  AR 37.  The job was three or four blocks from his house and he could walk to work.  *Id*.  The temporary position ended when regular employees returned from sick leave.  AR 36-37.

1    Prior to his work at John Deere and Chowchilla High School, Plaintiff was a journeyman

2  mechanic for over 15 years.  AR 36-38.   As a mechanic, the heaviest weight he had to lift was

3  100 pounds.  AR 37-38.  He was a foreman at one job for about one year, until he got

4  pneumonia.  AR 38.  He also did service writing for about six months, and off and on throughout

5  his years of working as a mechanic.  AR 39.  He stopped mechanic work in January, 2005,

6  because reaching overhead caused excessive pain.  AR 37-38.

7    On a scale of one to ten, Plaintiff describes his daily neck pain as "about a three."  AR 41-

8  42.  Reaching overhead with his left arm and looking up exacerbate his neck pain.  AR 42.  Cold

9  weather also increases the pain.  AR 46.  He has problems with his neck "snapping and cracking

10  and popping . . . every day."  AR 35.  While working at John Deere, Plaintiff had problems with

11  his neck and arm.  AR 33-34.  He sat in front of a computer for "hours on end" and had to get up

12  and stretch periodically.  *Id*.  He can look at a computer screen for about 10 to 15 minutes before

13  his neck gets "locked up," and he has to get up and walk around for about five minutes to stretch

14  it out.  AR 34-35, 42-43.

15    The pain in Plaintiff's left arm is on the outside of his shoulder, and occurs daily.  AR 48.

16  He can use his left arm for about an hour, as long as he is not lifting anything heavy, and then he

17  would have to stretch it out.  AR 52.  His left thumb and index finger have been numb every day

18  for a few years.  AR 48.  The numbness affects his ability to use his left hand because he cannot

19  feel what he is holding and he cannot grab objects.  AR 48-49.  However, he can feel extreme

20  temperatures in his left hand and he can sometimes perform fine finger manipulation.  AR 49.

21  He can hold up to 20 pounds with his left hand for five minutes, but then would need five to ten

22  minutes to rest.  AR 49-50.

23    Plaintiff is being treated for neck pain by his family doctor.  AR 46.  He takes Vicodin as

24  needed which is usually a couple times per day or week.  AR 46-47.  It makes the pain in his

25  neck and arm bearable, but it causes tiredness, and he has to lay down.  *Id*.  There are no other

26  side effects.  *Id*.  He prefers to take Advil when he can because he does not like to take narcotics

27  unless it is necessary.  *Id*.  He also treats his neck and shoulder with a hot pack, sometimes

28

nightly, until he goes to sleep.  AR 50.  He has not had epidural injections or physical therapy.
AR 50.

Surgery was performed is 2006, and again in 2007.  AR 35.  After the first surgery,
Plaintiff still had problems with pressure on his nerves.  *Id*.  The second surgery was not as
successful as he thought it would be.  *Id*.  He still has problems with his left hand, and the fingers
on his left hand are numb.  *Id*.  The doctor recommended an MRI to identify the cause of the
numbness, but Plaintiff could not afford the MRI and had no medical coverage.  AR 35-36.  He
did have two MRIs performed, but neither were on his left shoulder.  AR 36.

Once per week or once per month, Plaintiff has anxiety and panic attacks.  AR 40, 60.  He
does not know what triggers the anxiety attacks, but they occur when he is around large groups of
people.  *Id*.  Sometimes he can be around large groups of people and sometimes he cannot.  AR
40.  He does not do well around noise and kids, but does okay around family.  *Id*.  The timing of
the attacks is variable, so he does his shopping at night and avoids being around large groups of
people.  AR 41.  He had anxiety attacks when he worked as a service writer but not when he
worked as a janitor because there were no other people around.  AR 62.  When he has an anxiety
attack, his heart will start racing and he will start crying for no reason.  AR 61.  He takes Xanax
to relieve the attacks and it usually takes 20 to 30 minutes for the Xanax to begin working.  AR
60-61.

Plaintiff fights depression on a daily basis and has to force himself to get up.  AR 53.  He
stated that his depression is a lot better, but still varies day to day.  AR 64.  He also has a hard
time concentrating.  AR 62.  The longest he can focus or concentrate at one time is 10 to 15
minutes, then his mind wanders and he has to take a break.  AR 63.  It is a couple hours or the
next day before he could go back to what he was concentrating on.  *Id*.

Dr. Ziar, a psychiatrist, treats Plaintiff every one to three months, depending on how he
feels, and monitors his medications.  AR 58-59.  He is currently taking Wellbutrin, Cymbalta,
Abilify, and Alfrazonlan, but his medication is constantly being changed.  AR 53, 59.  He takes
his medications every day, as prescribed.  AR 60.  The medications help with the depression and

anxiety and he is able to function throughout the day.  *Id*.  Side effects of the Wellbutrin include insomnia and tiredness.  AR 59-60.

Plaintiff did not have to get permission from a doctor to go back to work.  AR 51.  Dr. Brant said Plaintiff could "do whatever [he] felt like [he] was capable of doing."  *Id*.  Overall, Plaintiff thinks his neck is about the same, but his arm is getting worse.  *Id*.  He has more pain more frequently, and the pain affects his ability to use his left arm.  AR 52.  Plaintiff feels that he cannot perform any work for eight hours per day, five days per week, because of pain in his arm and neck, and because he gets tired easily and cannot think clearly when he is tired.  AR 39.  Either the pain or his medications cause him to get tired.  AR 39-40.

The last time Plaintiff used illegal drugs was in 2006.  AR 65.  He used methamphetamines recreationally, once or twice per week for about a month.  *Id*.  The last time he consumed alcohol was the day before the hearing.  AR 66.  The last time he "tied one on" was about a year ago.  *Id*.  He does not usually have more than two drinks because the alcohol interacts with his medication and makes him sick.  AR 67.

**Medical Record**

The entire medical record was reviewed by the Court.  Summaries of the relevant reports and treatment notes are provided below.

***Satwant Samrao, M.D.***

On January 31, 2005, internist Satwant Samrao, M.D., completed an Employment Development Department (EDD) "Claim for Disability Insurance Benefits - Doctor's Certificate" on behalf of Plaintiff.  AR 232.  Dr. Samrao's diagnoses included cervical spondylitis with left-sided radiculopathy and depression.  *Id*.  He opined that Plaintiff was "incapable of performing his regular or customary work" as of January 9, 2005.  *Id*.  He anticipated releasing Plaintiff to return to work on March 31, 2005.  *Id*.

On August 25, 2005, Plaintiff was seen br Dr. Samrao for review of the MRIs done on August 2, 2005 at Community Regional Medical Center, Department of Medical Imaging.  AR 238-240.  The MRIs revealed mild central stenosis and left neural foraminal stenosis at C3-4 and bilateral neuroforaminal stenosis at C4-5.  AR 238.  They also revealed bilateral neuroforaminal

1    stenosis and mild central stenosis at C5-6 and left neuroforaminal stenosis C6-7.  *Id*.  Dr. Samrao

2    assessed Plaintiff with severe cervical spondylitis with stenosis of the cervical spinal cord and

3    stenosis of neural foramina at multiple levels.  *Id*.  He also assessed Plaintiff with hypertension,

4    chronic obstructive pulmonary disease (COPD), and hypercholesterolemia.  *Id*.  The doctor

5    referred Plaintiff to neurosurgery for evaluation of a laminectomy.  *Id*.

6         On December 15, 2005, Dr. Samrao completed an EDD "Request for Medical

7    Information" on behalf of Plaintiff.  AR 233-234.  The diagnoses included cervical spondylitis

8    with radiculopathy, cervical spinal stenosis, and COPD, based upon an MRI of the cervical spine.

9    *Id*.  The doctor noted that Plaintiff had been "disabled" as of January 9, 2005, and estimated that

10   he could resume work on February 28, 2006.  *Id*.

11        On December 16, 2005, Plaintiff was seen by Dr. Samrao for complaints of constant left

12   arm pain, occasional right arm pain, and left hand hypersensitivity to the thumb and pointer

13   finger.  AR 237.  Plaintiff stated that he tried physical therapy and chiropractic treatment with

14   minimal results.  *Id*.

15        On March 22, 2007, Plaintiff was seen by Dr. Samrao for medication refills and

16   complaints of fluctuating blood pressure.  AR 386.  The doctor assessed Plaintiff with

17   uncontrolled hypertension, hypercholesterolemia, benign prostatic hyperplasia (BPH), cervical

18   spondylitis with exploration and fusion, chronic pain syndrome, and insomnia.  *Id*.  Dalmane,

19   Alprazolam, and Premarin were prescribed.  *Id*.

20        On March 24, 2008, Plaintiff was seen for a Xanax refill.  AR 363.  Dr. Samrao noted

21   that Plaintiff's neck was a "little stiff" due to a laminectomy.  *Id*.  The doctor assessed Plaintiff

22   with hypertension under "good control," cervical spondylitis, and insomnia.  *Id*.  Alprazolam,

23   Lotensin, and Atenolol were prescribed.  *Id*.

24        On April 24, 2008, Plaintiff was seen for a monthly assessment.  AR 361.  He requested a

25   change in medications because they were not helping and he could not afford them.  *Id*.  Dr.

26   Samrao noted that Plaintiff's neck was "supple" and assessed him with hypertension under "good

27   control," chronic continuous smoking, cervical spondylitis, and depression with chronic anxiety

28   neurosis.  *Id*.  Benazepril, Atenolol, Alprazolam, and Cymbalta were prescribed.  *Id*.

On July 24, 2008, Plaintiff was evaluated again.  AR 359.  He requested a change in his medications because they were not helping him.  *Id.*  Dr. Samrao noted that Plaintiff's neck was "supple" and assessed him with weight gain due to cessation of smoking, hypertension under "good control," depression with anxiety neurosis, and BPH.  *Id.*  Benazepril, Atenolol, Cymbalta, Ambien, Wellbutrin, and Levitra were prescribed.  *Id.*

### *Ricardo S. Centeno, M.D.*

On March 29, 2006, radiologist Ricardo S. Centeno, M.D., at Chowchilla District Memorial Hospital, performed x-rays of Plaintiff's cervical spine at the request of Dr. Samrao.  AR 249.  The x-rays revealed multiple degenerative disc changes prominent spurs encroaching into the right intervertebral foramina.  *Id.*

### *Chowchilla Physical Therapy*

From April 20, 2005, to May 4, 2005, Plaintiff attended physical therapy at Chowchilla Physical Therapy, at the request of Dr. Samrao.  AR 254.  Plaintiff reported no change in left thumb hypersensitivity, but a 25 percent reduction in neck grinding noise that occurred with rotation.  *Id.*  He still complained of aching finger joints bilaterally.  *Id.*  The physical therapist noted overall mild improvement in muscle tone, range of motion, and pain after six visits.  *Id.*  An additional six visits were recommended.  *Id.*

### *Adam J. Brant, M.D.*

On April 19, 2006, Plaintiff was seen by neurosurgeon Adam J. Brant, at Neurosurgical Associates Medical Group, Inc., at the request of Dr. Samrao.  AR 296-299.  Plaintiff's chief complaints were cervical spondylosis and spinal stenosis.  AR 296.  Dr. Brant's account of Plaintiff's subjective statements is as follows:

> [Plaintiff] is a 48-year old male with at least a two year history of progressively worsening axial neck pain and left shoulder and arm pain. [Plaintiff] works as a mechanic.  He states that working under cars exacerbates his symptoms.  In 2004, [Plaintiff] was diagnosed with pneumonia and was hospitalized for fifteen days.  He states that his symptoms actually started at that time and have not eased up despite physical therapy with traction and chiropractic neck adjustments.  He has taken prescription anti-inflammatory medications and Vicodin, only with minimal relief.  His neck pain is exacerbated with neck movement.  He has radiation into the left trapezius and lateral arm to the forearm.  He has numbness of the thumb and index finger of the left hand.  He has trouble opening bottle caps.  When he is lying down at night, he feels exacerbation of the pain in his left arm while his head is lying on the pillow.  This is

relieved when he bends his head to the right side.  He can also reproduce the pain when he reaches for anything above his left shoulder using his left arm.  He denies experiencing electrical shocking sensations to his arms or legs with movement of the neck.  Overall, the severity of the pain in his arm is about 60%, with 40% for the neck.  He denies bowel dysfunction.  He has some difficulty initiating his urine.  This he attributes to Effexor and Cymbalta, and his primary care physician is well aware of it.  On a scale of 1-10, his pain is on average a 7.

*Id*.  Plaintiff's medications at the time included Micardis, Cymbalta, Alprazolam, Effexor, and Vicodin.  AR 297.

Dr. Brant's motor examination revealed 5/5 strength for deltoids, biceps, wrist flexors, wrist extensors, and hand intrinsics.  AR 297.  The triceps and infraspinatus were 4+/5 on the left and 5/5 on the right.  *Id*.  No atrophy was noted.  *Id*.  The sensory examination revealed no areas of diminished perception of pinprick in either upper or lower extremities.  *Id*.  Deep tendon reflexes were 1+ for triceps and brachioradialis, trace for biceps bilaterally, 2+ for patellars, and 1+ for ankle jerks.  *Id*.  The mechanical examination revealed normal range of motion in cervical flexion, extension, and left and right lateral rotation, but Plaintiff "grimace[d] secondary to pain during the maneuvers."  AR 298.  Spurling's maneuver was positive on the left and negative on the right.  *Id*.

Dr. Brant evaluated an MRI of the cervical spine dated August 2, 2005, from Community Medical Center, Fresno.  AR 298.  He opined that the quality was suboptimal for surgical evaluation, but the MRI nevertheless revealed evidence of multi-level degenerative disc space changes and a large left-sided posterolateral disc osteophyte complex at C3-4, resulting in foraminal stenosis.  *Id*.  It also revealed mild canal stenosis at C3-4 and mild bilateral neural foraminal narrowing at C4-5, C5-6, and C6-7.  *Id*.  Dr. Brant also evaluated a series of x-rays dated March 29, 2006, from Chowchilla District Memorial Hospital.  *Id*.  He identified multi-level degenerative disc space changes from C3-4 to C6-7 and preserved cervical lordosis with no evidence of subluxation.  *Id*.

Dr. Brant's overall impression was multi-level cervical degenerative disc disease, C3-4 disc herniation, and different levels of foraminal stenosis.  AR 298.  He noted that Plaintiff failed conservative treatment and opined that Plaintiff would most likely be a candidate for future surgical intervention.  *Id*.  Dr. Brant recommended a new MRI of the cervical spine without

1  contrast, a bone scan with SPECT images of the cervical spine, and plain x-rays with lateral

2  extension and flexion views.  *Id.*

3       On August 25, 2006, Plaintiff was seen by Dr. Brant for a follow-up visit.  AR 294-295.

4  Plaintiff complained of persistent axial neck pain radiating to the top of the left shoulder and

5  lateral arm, terminating at the thumb and index finger of the left hand.  AR 294.  Plaintiff also

6  stated that he began experiencing similar symptoms in the right arm.  *Id.*  Dr. Brant's

7  examination revealed 5/5 motor strength in the upper extremities, except for 4+/5 in the left

8  trapezius and 4/5 in the left infraspinatus.  *Id.*  Dr. Brant reviewed the cervical spine x-rays, MRI,

9  and bone scan, performed by Advanced Medical Imaging on June 30, 2006.  AR 280-284, 294.

10  He diagnosed Plaintiff with advanced cervical degenerative disc disease and foraminal stenosis at

11  multiple levels, most severe at left C3-4.  AR 295.  He recommended surgery consisting of

12  anterior cervical discectomy at C3-4, C4-5, and C5-6, followed by fusion and placement of plate

13  and screws.  *Id.*  He noted that Plaintiff wished to proceed with the recommendation.  *Id.*

14       On November 20, 2006, Dr. Brant performed surgery on Plaintiff at Community Medical

15  Center, Fresno.  AR 288-291.  The procedure consisted of anterior cervical decompression and

16  fusion, C3-4, C4-5, and C5-6, insertion of interbody spacers for fusion, anterior cervical plating,

17  and use of bone morphogenetic protein for fusion.  AR 288.

18       On December 8, 2006, Plaintiff was seen by Dr. Brant for post-surgery follow-up.  AR

19  286-287.  The doctor noted that Plaintiff was recovering reasonably well, but Plaintiff reported a

20  significant degree of posterior cervical pain extending into the tops of both shoulders and

21  occasionally into the left upper arm.  AR 286.  Plaintiff's wife stated that she felt he was doing

22  "quite well" and "sees progress from day to day."  *Id.*  The doctor noted 5/5 strength bilaterally in

23  all muscle groups and normal gait.  *Id.*  The doctor opined that more time was needed to

24  determine how much improvement Plaintiff had from the surgery.  *Id.*

25       On January 23, 2007, Plaintiff was seen by Dr. Brant for post-surgery follow-up.  AR

26  390-391.  He complained of pain in the posterior cervical region and frequent occipital

27  headaches.  AR 390.  He also complained of left arm pain and numbness of the third and fourth

28  finger of his left hand, which were absent until two weeks prior to the appointment.  *Id.*   The

doctor noted 5/5 strength bilaterally in all muscle groups. *Id.* The doctor reviewed the cervical X-rays performed on January 17, 2007, and opined that the fusion construct appeared stable. *Id.* He noted that Plaintiff's recent left arm pain was in "somewhat of a different distribution from prior to surgery." *Id.*

On February 2, 2007, Plaintiff was seen by Dr. Brant for post-surgery follow-up. AR 388-389. The doctor measured Plaintiff's strength at 5/5 bilaterally throughout his upper extremities and noted that Plaintiff had not lost any of the strength that he regained after the surgery. AR 388. He also noted that Plaintiff experienced complete resolution of his upper extremity pain and numbness for six weeks following surgery, but then began having recurrent pain and numbness in his left arm and hand. AR 388. The doctor recommended a new cervical MRI and new cervical x-rays. *Id.*

On March 30, 2007, Plaintiff was seen by Dr. Brant for another post-surgery follow-up. AR 385. Plaintiff's left upper extremity pain was unchanged from his last visit. *Id.* He reported occasional aching pain in his upper lateral right arm, posterior cervical pain, and occipital headaches. *Id.* Physical examination revealed 5/5 strength bilaterally. Id. Dr. Brant reviewed the cervical x-rays and MRI performed on March 7, 2007 at Advanced Medical Imaging. AR 356-358, 385. He opined that the fusion construct was stable and noted advanced degenerative disc disease at C6-7. AR 385. He further opined that there was marked improvement in Plaintiff's previously severe canal stenosis at C3-4, although there was some osteophytic ridging and mild to moderate foraminal narrowing. *Id.* The doctor also identified mild residual canal stenosis and moderate bilateral foraminal stenosis at C5-6, and mild canal stenosis and moderate bilateral foraminal stenosis at C6-7. *Id.*

On August 17, 2007, Plaintiff was seen by Dr. Brant for follow-up and review of his testing. AR 376-377. Plaintiff complained of intermittent severe pain in the left lateral arm from the shoulder to the elbow. AR 376. There was no significant pain below the left elbow and no significant pain in the right shoulder or arm. *Id.* Plaintiff's neck was occasionally sore but the pain was not severe and not progressive. *Id.* On examination, strength was full throughout the upper extremities. *Id.* The doctor opined that the EMG/NCV study of the left arm performed by

1  Perminder Bhatia, M.D., on July 31, 2007, demonstrated possible left C5-6 radiculopathy and

2  possible mild ulnar nerve entrapment at the wrist.  AR 347-349, 376.

3       Dr. Brant reviewed the cervical CT myelogram performed on May 8, 2007, by Advanced

4  Medical Imaging, and opined that Plaintiff's residual intermittent left arm pain was possibly

5  related to his residual foraminal stenosis at left C4-5 and C5-6.  AR 351-355, 376.  The doctor

6  recommended that Plaintiff consider additional surgical treatment, consisting of posterior

7  cervical foraminotomies, if Plaintiff felt his symptoms were severe enough.  AR 376.  The doctor

8  estimated the chance of significant improvement or relief of Plaintiff's left upper arm pain to be

9  60 to 70 percent.  *Id*.  Plaintiff elected to proceed with the surgery.  AR 377.

10      On October 19, 2007, Dr. Brant performed surgery on Plaintiff at Community Medical

11  Center, Fresno.  AR 370-372.  The procedure consisted of posterior cervical foraminotomies at

12  C4-5 and C5-6.  The surgery was uncomplicated and Plaintiff was discharged in stable condition

13  on postoperative day two.  AR 370.

14      On November 3, 2007, Plaintiff was seen by Dr. Brant for follow-up.  AR 368-369.  The

15  doctor noted that Plaintiff was "recovering well" from surgery.  AR 368.  Plaintiff stated that two

16  days prior to the appointment he began having some aching in his left shoulder and arm, but that

17  he had trouble determining whether the pain was post-surgical, or a recurrence of his pre-

18  operative pain.  AR 368.  Dr. Brant noted that Plaintiff was taking between two and six Norco

19  tablets per day.  *Id*.  He recommended that Plaintiff maintain a light level of activity with as

20  much walking as possible, take ibuprofen as needed, and restrict his use of Norco to

21  "breakthrough" pain only.  *Id*.

22      On December 14, 2007, Plaintiff was seen by Dr. Brant for follow-up.  AR 366-367.

23  Plaintiff stated that he was "quite a bit better than before surgery," although he was still having

24  left shoulder pain.  AR 366.  He also stated that, prior to surgery, he was consistently taking eight

25  Norco tablets per day for pain control, but, after surgery, was taking only one or two per day with

26  less pain.  *Id*.  Post-surgical neck pain had diminished greatly.  *Id*.  Physical examination revealed

27  full strength throughout the upper extremities but marked pain of the left shoulder to passive

28

1  internal and external rotation.  *Id.*  The doctor recommended a MRI of the shoulder.  AR 366-

2  367.

3              ***Khashayar Dashtipour, M.D.***

4          On June 4, 2006, neurologist Khashayar Dashtipour, M.D., at MDSI Physician Services,

5  performed a comprehensive orthopedic evaluation of Plaintiff at the request of the Social

6  Security Administration.  AR 255-258.  Plaintiff complained of neck, right arm, and left arm

7  pain.  AR 255.  He stated that his symptoms had become worse and neither chiropractic

8  treatment nor physical therapy helped.  *Id.*  He rated his pain as three out of ten.  *Id.*  His

9  medications were Cymbalta, Alprazolam, Effexor, Aciphex, and Lamictal.  AR 256.  Dr.

10  Dashtipour noted that Plaintiff was independent with all of his personal care and hygiene, and did

11  housework, cooked, swept, mopped, shopped for groceries, and drove his car.  *Id.*

12          Dr. Dashtipour's physical examination revealed discomfort during range of motion of

13  Plaintiff's neck on flexion, forward flexion, extension, and lateral flexion, but no presence of

14  paravertebral muscle spasm, tenderness, crepitus, effusion, deformity, or trigger point.  AR 257.

15  The motor strength and muscle examination revealed normal tone, bulk, and strength bilaterally,

16  and normal handgrip bilaterally.  *Id.*  Plaintiff could make a fist with both hands without any

17  problems.  *Id.*  The doctor noted that Plaintiff's sensation to light touch, which was less in the left

18  side than in the right, was not consistent with the examination.  *Id.*  Other examination findings

19  were unremarkable.  AR 255-258.  The doctor diagnosed Plaintiff with neck and left arm pain

20  secondary to cervical radiculopathy.  AR 257.

21          Dr. Dashtipour opined that Plaintiff was not restricted in the number of hours he could be

22  expected to stand, walk, or sit, in an eight-hour workday, and that he could lift and carry 50

23  pounds frequently and 75 pounds occasionally.[3]  AR 257-258.  The doctor identified

24  manipulative limitations with tasks that require repetitive flexion and extension of the neck or

25

26

27          [3] Dr. Dashtipour actually states, "The amount of weight the claimant can lift and carry frequently and
occasionally is limited to 50 pounds occasionally and 75 pounds frequently...."  The court presumes that the doctor

28  mistakenly transposed the numbers, and intended to state, "75 pounds occasionally and 50 pounds frequently."

1   movement of the arms above the shoulders.  AR 258.  The doctor found no postural limitations
2   and no relevant visual, communicative, or workplace environmental limitations.  *Id*.

3               *Latif Ziyar, M.D.*

4       On July 27, 2005, Plaintiff was seen by psychiatrist Latif Ziyar, M.D., for complaints of
5   depression.  AR 338.  Dr. Ziyar diagnosed Plaintiff with major depressive disorder and
6   prescribed Cymbalta.  *Id*.

7       On October 18, 2006, Plaintiff was seen by Dr. Ziyar for complaints of severe panic
8   attacks.  AR 309.  Dr. Ziyar diagnosed Plaintiff with bipolar disorder and prescribed Wellbutrin,
9   Cymbalta, Ambien CR, and Niravam.  *Id*.

10      On January 19, 2007, Dr. Ziyar completed a "Short-Form Evaluation For Mental
11  Disorders."  AR 303-305.  Dr. Ziyar diagnosed Plaintiff with major depressive disorder.  AR
12  303.  The doctor's mental status examination revealed that Plaintiff's motor activity included
13  tremors and agitation.  *Id*.  His concentration was mildly impaired, his immediate memory was
14  impaired, and his mood was anxious and depressed.  AR 303-304.  The doctor rated Plaintiff's
15  abilities to understand, remember, and carry out complex instructions, and to maintain
16  concentration, attention, and persistence, as poor.  AR 305.  The doctor's handwritten notes
17  indicate that Plaintiff was making progress and that he is compliant with treatment.  *Id*.  Other
18  findings were unremarkable.  AR 303-305.

19      On January 19, 2007, Dr. Ziyar prepared a letter addressed to the Department of Social
20  Services identifying Plaintiff's diagnoses as major depressive disorder and anxiety disorder and
21  opining that Plaintiff was incapable of maintaining a regular job at that time, although his
22  condition may improve in the future.  AR 302.

23              *Ekram Michiel, M.D.*

24      On May 21, 2006, psychiatrist Ekram Michiel, M.D., at MDSI Physician Services,
25  performed a comprehensive psychiatric evaluation of Plaintiff.  AR 250-253.  Plaintiff
26  complained of depression, anxiety, paranoia, and visual and auditory hallucinations.  AR 250.
27  His medications included Cymbalta, Effexor, Vicodin, Lorazepam, and Micardis.  *Id*.  Plaintiff
28  stated that he went to Madera Community Hospital on June 22, 2005, after having suicidal

ideations.  AR 250-251.  Plaintiff reported drinking six beers per day until six months prior to the appointment.  AR 251.  He also reported methamphetamine use once or twice per week for two years, ceasing in May 2006.  *Id*.  Plaintiff does household chores, goes to the store, and uses his computer.  *Id*.

The Mental status examination revealed normal gait and posture and no involuntary movements or specific mannerisms.  AR 251.  Speech was normal and eye contact was good.  *Id*.  He denied suicidal and homicidal thoughts and his thought content was not delusional.  *Id*.  He admitted visual and auditory hallucinations and paranoia, but Dr. Michiel found no response to internal stimuli and no paranoia.  *Id*.  Plaintiff described him mood as depressed but the doctor noted his affect as appropriate.  *Id*.

With regard to intellectual functioning, Plaintiff was oriented to place, person, and date.  AR 252.  He did digit span five forwards and five backwards, registered three items after five minutes, and knew his date of birth, phone number, address, and recent presidents of the United States.  *Id*.  He was able to perform mathematical calculations and follow a three-step command. Id.  His thinking was concrete and he understood similarities and differences.  *Id*.

Dr. Michiel diagnosed Plaintiff with alcohol dependence in early remission, amphetamine dependence in early remission, and depressive disorder not otherwise specified (NOS).  AR 252.  He assigned Plaintiff a GAF score of 65-70.[4]  *Id*.  He opined that Plaintiff was capable of maintaining attention and concentration to carry out simple job instructions, but not extensive varieties of technical or complex job instructions.  AR 253.  He further opined that Plaintiff was capable of relating appropriately to coworkers, supervisors, and the public.  *Id*.  The doctor indicated that Plaintiff's depressive symptoms would not prevent him from maintaining the attention and concentration needed to perform simple and repetitive tasks, but may affect him

---

[4] The Global Assessment of Functioning or "GAF" scale reflects a clinician's judgment of the individual's overall level of functioning.  *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed. 2000) ("DSM IV").  A GAF between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM- IV at 34.

1   in dealing with the usual stress encountered in a competitive work environment and in

2   performing detailed and complex tasks.  *Id*.

3                    ***Physical Residual Functional Capacity Assessment***

4           On June 16, 2006, state agency medical consultant G. W. Bugg completed a Physical

5   Residual Functional Capacity (RFC) Assessment.  AR 259-263.  The doctor diagnosed Plaintiff

6   with cervical radiculopathy, canal stenosis, and neuroforaminal encroachment.  AR 259.  He

7   opined that Plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently,

8   stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about

9   six hours in an eight-hour workday, and push and/or pull without restriction.  AR 260.  The

10  doctor limited Plaintiff to occasional climbing, crouching, crawling, and reaching.  AR 261.

11  There were no visual, communicative, or environmental limitations.  AR 261-262.  On May 10,

12  2007, state agency medical consultant C. H. Dudley affirmed the physical RFC assessment as

13  written.  AR 344-346.

14                    ***Mental Residual Functional Capacity Assessment***

15          On June 27, 2006, state agency psychiatric consultant, Robert Y. Hood, M.D., completed

16  a Mental RFC Assessment.  AR 275-277.  The doctor indicated that Plaintiff was moderately

17  limited in his ability to understand and remember detailed instructions, but had no other

18  significant limitations of his understanding and memory.  AR 275.  The doctor also indicated that

19  Plaintiff was moderately limited in his ability to carry out detailed instructions, but had no other

20  significant limitations of sustained concentration and persistence.  AR 275-276.  Plaintiff was

21  moderately limited in his abilities to interact appropriately with the general public, accept

22  instructions and respond appropriately to criticism from supervisors.  He had no other significant

23  limitations of social interaction.  AR 276.  He had no significant limitations of adaptation.  *Id*.

24          Dr. Hood opined that Plaintiff could understand and remember simple tasks for two hour

25  increments, maintain simple tasks for a 40 hour work week, adapt to usual workplace settings,

26  and travel to work using public transportation.  AR 277.  However, the doctor recommended

27  limited social and public contact.  *Id*.

28  ///

1      **ALJ's Findings**

2          The ALJ found that Plaintiff had not engaged in substantial gainful activity since January

3      9, 2005, and had the severe impairments of status post-two cervical surgeries, left shoulder pain,

4      and anxiety.  AR 13.  Nonetheless, the ALJ determined that the severe impairments did not meet

5      or exceed one of the listed impairments.  *Id*.

6          The ALJ reviewed the medical evidence and determined that Plaintiff had the RFC to

7      perform light work, except that he was restricted to limited contact with the public.  AR 14.  The

8      ALJ also found that Plaintiff was unable to perform any past relevant work.  AR 20.  The ALJ

9      identified Plaintiff as "closely approaching advanced age" on the date of the decision, and noted

10     that he had at least a high school education and could communicate in English.  *Id*.

11     Transferability of job skills was not an issue because the Medical-Vocational Rules ("grids")

12     supported a finding of "not disabled" whether or not Plaintiff had transferable job skills.  *Id*.  The

13     ALJ considered Plaintiff's age, education, work experience, and RFC, and concluded that jobs

14     exist in significant numbers in the national economy that Plaintiff could perform.  *Id.*

15     Accordingly, a finding of "not disabled" was made, as defined in the Social Security Act.  AR 21.

16                                  **SCOPE OF REVIEW**

17         Congress has provided a limited scope of judicial review of the Commissioner's decision

18     to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

19     the Court must determine whether the decision of the Commissioner is supported by substantial

20     evidence.  42 U.S.C. § 405 (g).  Substantial evidence means "more than a mere scintilla,"

21     *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v.*

22     *Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a

23     reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at

24     401.  The record as a whole must be considered, weighing both the evidence that supports and

25     the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993,

26     995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must

27     apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).

28     This Court must uphold the Commissioner's determination that the claimant is not disabled if the

1  Secretary applied the proper legal standards, and if the Commissioner's findings are supported by

2  substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th

3  Cir. 1987).

4  ## **REVIEW**

5          In order to qualify for benefits, a claimant must establish that he is unable to engage in

6  substantial gainful activity due to a medically determinable physical or mental impairment which

7  has lasted or can be expected to last for a continuous period of not less than twelve months.  42

8  U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of

9  such severity that he is not only unable to do her previous work, but cannot, considering his age,

10 education, and work experience, engage in any other kind of substantial gainful work which

11 exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

12 The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th

13 Cir. 1990).

14         In an effort to achieve uniformity of decisions, the Commissioner has promulgated

15 regulations which contain, inter alia, a five-step sequential disability evaluation process.  20

16 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f).  Applying this process in this case, the ALJ found

17 that Plaintiff: (1) had not engaged in substantial gainful activity since January 9, 2005, the

18 alleged onset of his disability; (2) has an impairment or a combination of impairments that is

19 considered "severe" based on the requirements in the Regulations (20 CFR §§ 416.1521 *et seq*));

20 (3) does not have an impairment or combination of impairments which meets or equals one of the

21 impairments set forth in 20 CFR Part 404, Subpart P, Appendix 1; and (4) could not perform his

22 past relevant work; but (5) could perform jobs that exist in significant numbers in the national

23 economy.  AR 13-20.

24         Here, Plaintiff argues that: (1) the ALJ failed to adequately consider whether Plaintiff's

25 impairments met or equaled a listed impairment; (2) the ALJ's use of the grids was inappropriate

26 due to Plaintiff's significant non-exertional limitations; (3) the ALJ failed to provide clear and

27 convincing reasons to reject Plaintiff's subjective pain limitations.

28 ///

# DISCUSSION

### A.    Plaintiff's Impairments at Step Three

Plaintiff argues that the ALJ failed to adequately consider whether Plaintiff's impairments met or equaled a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1525 and 404.1526), specifically, Listing 1.04a for "Disorders of the Spine."  Defendant argues that the ALJ properly determined that Plaintiff did not have an impairment that met or equaled a listing.

The listings of impairments describe impairments "that are considered severe enough to prevent an adult from doing any gainful activity."  20 C.F.R. § 416.925(a).  Most of these impairments are permanent or expected to result in death.  *Id.*  For all other impairments, the evidence must show that the impairment has lasted or is expected to last for a continuous period of at least 12 months.  *Id.*  If a claimant's impairment meets or equals a listed impairment, he or she will be found disabled at step three without further inquiry.  20 C.F.R. § 416.920(d).

To demonstrate that an impairment matches a listed impairment, the claimant must show that the impairment meets *all* of the medical criteria in a Listing.  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Id.*  To "equal" a listed impairment, a claimant must establish symptoms, signs and laboratory findings "at least equal in severity and duration" to the characteristics of a relevant listed impairment."  *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999); 20 C.F.R. §§ 404.1526(a), 416.926(a).  Under the law of this circuit, an ALJ is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence.  *Burch v. Barnhart,* 400 F.3d 676, 683 (9th Cir. 2005); *See Lewis v. Apfel,* 236 F.3d 503, 514 (9th Cir. 2001) (in distinguishing *Marcia v. Sullivan,* 900 F.2d 172 (9th Cir. 1990), the court determined that the ALJ's failure to consider equivalence was not reversible error because the claimant did not offer any theory, plausible or otherwise, as to how his impairments combined to equal a listing impairment).

1     Here, the ALJ stated, "The impairments listed in Appendix 1, Subpart P, CFR Part 404

2     which are most nearly applicable to [Plaintiff's] medically determinable impairments,

3     particularly sections 1.00, 12.04 and 12.06, have been reviewed and the criteria are not met or

4     medically equaled." AR 13. Although the ALJ did not specifically elaborate on his rationale

5     under the severity impairments heading, he provided a comprehensive recitation of the medical

6     evidence which provided an adequate statement of the foundations on which the ultimate factual

7     conclusions [were] based." *Gonzalez v. Sullivan*, 914 F. 2d 1197, 1201 (9th Cir. 1990) ("The

8     [Commissioner's four page "evaluation of the evidence" is an adequate statement of the

9     "foundations on which the ultimate factual conclusions are based." To require the ALJ's to

10    improve their literary skills in this instance would unduly burden the social security disability

11    process.")(citation omitted). AR 14-17.

12    Moreover, the ALJ was not required to provide further discussion unless Plaintiff

13    presented evidence in an effort to establish equivalence. *Burch*, 400 F.3d at 683.

14    Listing 1.04a states:

15    *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal
      stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture),
16    resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.
      With:
17    A. Evidence of nerve root compression characterized by neuro-anatomic distribution of
      pain, limitation of motion of the spine, motor loss (atrophy with associated muscle
18    weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is
      involvement of the lower back, positive straight-leg raising test (sitting and supine);

19

20    20 C.F.R. Part 404, Subpart P, Appendix 1.

21    Here, Plaintiff was diagnosed with spinal stenosis and degenerative disc disease. AR

22    233-234, 238, 249, 259, 295, 298, 385. However, Plaintiff did not present, or attempt to present,

23    any evidence of nerve root compression characterized by neuro-anatomic distribution of pain,

24    limitation of motion of the spine, or motor loss accompanied by sensory or reflex loss. In April

25    2006, Dr. Brant noted no atrophy, no sensory loss, normal reflexes, and normal range of motion.

26    AR 296-299. In June 2006, Dr. Dashtipour noted normal range of motion and no presence of

27    paravertebral muscle spasm, tenderness, crepitus, effusion, deformity, or trigger point. AR 257.

28    He also noted that sensation to light touch was not consistent with the examination. *Id*. In

1   December 2006, after the first surgery, Plaintiff's wife stated that he was doing "quite well."  AR

2   286.  In December 2007, after the second surgery, Plaintiff stated that he was "quite a bit better

3   than before surgery" and had significantly reduced his use of pain medication.  AR 366.  In April

4   2008, Plaintiff's neck was described as "supple."  AR 359, 361.  Repeated motor strength

5   examinations revealed 4/5 to 5/5 strength, increasing to 5/5 after surgery.  AR 257, 286, 294,

6   297, 366, 376, 385, 388, 390.

7          Plaintiff argues that his diagnoses and subjection to two spinal surgeries are evidence of a

8   listing-level impairment.  This argument is unpersuasive.  Surgery is not a qualifying factor for

9   Listing 1.04a and is thus irrelevant to the ALJ's finding at step three.  In addition, the mere

10   diagnosis of an impairment is not sufficient to sustain a finding of disability.  *Key v. Heckler*, 754

11   F.2d 1545, 1549 (9th Cir. 1985); *See also Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993)

12   (mere existence of impairment is insufficient proof of disability).

13          Plaintiff further argues that the ALJ should have utilized a medical expert to determine

14   listing level severity.  In general it is the duty of the claimant to prove to the ALJ that he is

15   disabled.  20 C.F.R. § 404.1512(a).  To this end, he must bring to the ALJ's attention everything

16   that supports a disability determination, including medical or other evidence relating to the

17   alleged impairment and its effect on his ability to work.  *Id.*  The ALJ has the responsibility to

18   develop "a complete medical history" and to "make every reasonable effort to help [the plaintiff]

19   get medical reports."  20 C.F.R. § 404.1512(d).   If this information fails to provide a sufficient

20   basis for making a disability determination, or the evidence conflicts to the extent that the ALJ

21   cannot reach a conclusion, he may seek additional evidence from other sources. 20 C.F.R. §§

22   404.1512(e);  404.1527(c)(3), see also *Mayes v. Massanari*, 262 F.3d 963, 968 (9th Cir.2001).

23          Here, the ALJ conducted a thorough review of the entire record and thereafter made a

24   disability determination.  Upon complete evaluation of the evidence, the ALJ determined that the

25   record was adequate to make a determination.  Under these circumstances, the ALJ had no duty

26   to further develop the record.

27          In sum, the ALJ was not required to compare Plaintiff's impairment or combination of

28   impairments to a listing, or provide discussion of such a comparison, because Plaintiff failed to

1  provide evidence that his impairment or combination of impairments met or equaled a listing.

2  The ALJ appropriately made a finding of "not disabled" at step three and proceeded to step four.

3          **B.**        ***Plaintiff's Subjective Pain Limitations***

4         Plaintiff argues that the ALJ failed to provide clear and convincing reasons for rejecting

5  Plaintiff's subjective pain limitations.  Defendant argues that the ALJ properly assessed

6  Plaintiff's credibility.

7         A two step analysis applies at the administrative level when considering a claimant's

8  subjective symptom testimony.  *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). First, the

9  claimant must produce objective medical evidence of an impairment that could reasonably be

10  expected to produce some degree of the symptom or pain alleged.  *Id*. at 1281-1282.  If the

11  claimant satisfies the first step and there is no evidence of malingering, the ALJ may reject the

12  claimant's testimony regarding the severity of his symptoms only if he makes specific findings

13  that include clear and convincing reasons for doing so.  *Id*. at 1281.  The ALJ must "state which

14  testimony is not credible and what evidence suggests the complaints are not credible." *Mersman*

15  *v. Halter*, 161 F.Supp.2d 1078, 1086 (N.D. Cal. 2001), quotations & citations omitted ("The lack

16  of specific, clear, and convincing reasons why Plaintiff's testimony is not credible renders it

17  impossible for [the] Court to determine whether the ALJ's conclusion is supported by substantial

18  evidence"); Social Security Ruling ("SSR") 96-7p (ALJ's decision "must be sufficiently specific

19  to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave

20  to the individual's statements and reasons for that weight").

21         An ALJ can consider many factors when assessing the claimant's credibility.  *See Light v.*

22  *Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).  The ALJ can consider the claimant's

23  reputation for truthfulness, prior inconsistent statements concerning his symptoms, other

24  testimony by the claimant that appears less than candid, unexplained or inadequately explained

25  failure to seek treatment, failure to follow a prescribed course of treatment, claimant's daily

26  activities, claimant's work record, or the observations of treating and examining physicians.

27  *Smolen*, 80 F.3d at 1284; *Orn v. Astrue*, 495 F.3d 625, 638 (2007).

28

1    The first step in assessing Plaintiff's subjective complaints is to determine whether

2    Plaintiff's condition could reasonably be expected to produce the pain or other symptoms

3    alleged. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). Here, the ALJ found that

4    Plaintiff had the severe impairments of status post-two cervical surgeries, left shoulder pain, and

5    anxiety. AR 13. He further found as follows:

6        [Plaintiff's] medically determinable impairments could reasonably be expected to cause
         some of the alleged symptoms; however, [Plaintiff's] statements concerning the intensity,
7        persistence and limiting effects of these symptoms are partially credible, to the extent
         they are inconsistent with the above residual functional capacity assessment."
8

9    AR 19. This finding satisfied step one of the credibility analysis. *Smolen*, 80 F.3d at 1281-1282.

10   Because the ALJ did not find that Plaintiff was malingering, he was required to provide

11   clear and convincing reasons for rejecting Plaintiff's testimony. *Smolen*, 80 F.3d at 1283-1284;

12   *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996) (as amended). When there is evidence of an

13   underlying medical impairment, the ALJ may not discredit the claimant's testimony regarding the

14   severity of his symptoms solely because they are unsupported by medical evidence. *Bunnell v.*

15   *Sullivan*, 947 F.2d 341, 343 (9th Cir. 1991); SSR 96-7. Moreover, it is not sufficient for the ALJ

16   to make general findings; he must state which testimony is not credible and what evidence in the

17   record leads to that conclusion. *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *Bunnell*,

18   947 F.2d at 345-346.

19   In this case, the ALJ made several credibility findings. He noted that:

20       [Plaintiff] testified that he cannot be around crowds or noise, yet he recently traveled with
         his family to Laughlin, Nevada and Las Vegas. He and his parents eat out at restaurants
21       for breakfast on a regular basis. These activities contradict this testimony. [Plaintiff]
         lives independently and is able to care for his personal needs. He also testified that his
22       anxiety attacks are less frequent, which indicates improvement in his medical condition,
         as well as his testimony that his neurosurgeon told him that he could return to work if he
23       felt up to it. I also note that [Plaintiff's] initial application focused on his physical
         impairments, and that his allegations of mental symptoms increased only after the initial
24       denial.

25   AR 19-20. (Citations omitted).

26   Plaintiff disputes the credibility finding in general, but does not address the majority of

27   the specific findings made by the ALJ. Plaintiff argues that it was improper for the ALJ to reject

28

1   Plaintiff's subjective pain because of his daily activities.  However, daily activities are

2   specifically identified as a factor the ALJ may consider in making a credibility finding.  *Orn*, 495

3   F.3d at 638.  Here, the ALJ noted that Plaintiff lives independently and is able to care for his

4   personal needs.  This finding is supported by substantial evidence.  Plaintiff testified that he lives

5   alone in a house (AR 27, 54) and that he has a driver's license and drives three days per week.

6   AR 28.  Dr. Dashtipour noted that Plaintiff was independent with all of his personal care and

7   hygiene, and did housework, cooked, swept, mopped, shopped for groceries, and drove his car.

8   AR 256.  Dr. Michiel noted that Plaintiff did household chores, went to the store, and used his

9   computer.  AR 251.

10       Contrary to Plaintiff's argument, Plaintiff's daily activities are "easily transferable" to the

11   workplace because he is able to provide for his own personal needs.   Thus, it appears that

12   Plaintiff is "quite functional."  *Burch v. Barnhart*, 400 F.3d 680, 681 (9th Cir. 2005).  "If a

13   claimant is able to perform household chores and other activities that involve many of the same

14   physical tasks as a particular type of job, it would not be farfetched for an ALJ to conclude that

15   the claimant's pain does not prevent the claimant from working."  *Fair v. Bowen*, 885 F.2d at

16   603.  In addition, there is no evidence, as Plaintiff contends, that his daily activities are "isolated"

17   or "once daily."  This contradicts the record and Plaintiff's own testimony.

18       It is not the role of the Court to redetermine Plaintiff's credibility *de novo.*  Although

19   evidence supporting an ALJ's conclusions might also permit an interpretation more favorable to

20   the claimant, if the ALJ's interpretation of evidence was rational, as here, the Court must uphold

21   the ALJ's decision where the evidence is susceptible to more than one rational interpretation.

22   *Burch v. Barnhart*, 400 F.3d 676, 680-81 (9th Cir. 2005).

23       *C.    ALJ's Use of the Grids*

24       Plaintiff argues that the ALJ's use of the grids at step five was inappropriate in light of

25   Plaintiff's non-exertional limitations.  Defendant argues that the ALJ's finding at step five was

26   supported by substantial evidence.

27       The claimant has the initial burden of proving the existence of a disability within the

28   meaning of the Social Security Act.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).  The

claimant establishes a prima facie case of disability by showing that a physical or mental

impairment prevents him or her from engaging in his or her previous occupation. *Gallant v.*

*Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984); 20 C.F.R. §§ 404.1520(f) and 416.920(f).

However, once the claimant establishes a prima facie case of disability, the burden of going

forward with the evidence shifts to the Secretary. *Hammock v. Bowen*, 867 F.2d 1209 (9th Cir.

1989).  The Secretary bears the burden of establishing the existence of alternative jobs available

to the claimant, given his or her age, education, and medical-vocational background.  In an

appropriate case, the Secretary may meet this burden through application of the medical-

vocational guidelines set forth in the regulations.[5]  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2

("Appendix 2"); *Heckler v. Campbell*, 461 U.S. 458 (1983); *Odle v. Heckler*, 707 F.2d 439, 440

(9th Cir. 1983).  If the guidelines do not accurately describe a claimant's limitations, the

Secretary may not rely on them alone to show availability of jobs for the claimant. *Desrosiers v.*

*Secretary*, 846 F.2d 573 (9th Cir. 1988).  However, the mere allegation of the presence of a non-

exertional impairment is not sufficient to preclude application of the guidelines.  Such non-

exertional impairment must be found to significantly limit the range of work permitted by a

claimant's exertional limitations before the Secretary will be required to obtain expert vocational

testimony regarding the availability of other work.  *See, e.g., Polny v. Bowen,* 864 F.2d 661 (9th

Cir. 1988); *Burkhart v. Bowen*, 856 F.2d 1335 (9th Cir. 1988); *Razey v. Heckler*, 785 F.2d 1426,

1430 (9th Cir. 1986) (modified 794 F.2d 1348 (1986)); and *Perminter v. Heckler*, 765 F.2d 870

(9th Cir. 1985).

      Here, the ALJ found Plaintiff had the RFC to perform unskilled light work with the non-

exertional limitation that Plaintiff was restricted to limited contact with the public.  AR 14.  He

further found that Plaintiff's additional limitations had little or no effect on the occupational base

of unskilled light work.  AR 21.  The ALJ applied the medical-vocational guidelines as a

---

[5] For any given combination of factors (residual functional capacity, age, education, and work experience), the guidelines direct a conclusion of disability or nondisability when they accurately describe a claimant's particular limitations.

1   framework and determined that jobs exist in significant numbers in the national economy that the

2   Plaintiff can perform.  AR 20-21.

3   However, the record contains substantial evidence of Plaintiff's non-exertional

4   limitations that the ALJ failed to consider in his RFC and in his determination that there was

5   little or no effect on the occupational base of unskilled light work.

6   Dr. Ziyar, Plaintiff's treating psychiatrist, opined that Plaintiff's concentration and

7   immediate memory were impaired, that he could not understand, remember, and carry out

8   complex instructions, and that he could not maintain concentration, attention, and persistence.

9   AR 303-305.  These limitations were not reflected in the RFC.  AR 14.  The ALJ gave "some"

10  weight to Dr. Ziyar's opinion, but only "insofar as his diagnosis."  AR 17.  The ALJ rejected Dr.

11  Ziyar's opinion that Plaintiff was incapable of work because of Plaintiff's "improved mental

12  state."  *Id*.  This constitutes error on several levels.

13  First, there is insufficient evidence in the record that Plaintiff's mental state is improving.

14  In support of this claim, the ALJ cites an August 15, 2006, treatment note indicating that Plaintiff

15  was "feeling good" and the medication was helping.  AR 15, 312.  He also relies on a July 24,

16  2008, treatment note documenting that Plaintiff requested to discontinue Abilify, one of his

17  medications.  AR 15, 359.  However, Plaintiff requested to discontinue Abilify because he did

18  not think it was helping, not because his mental state had improved and the medication was no

19  longer necessary.  AR 359.

20  Second, the ALJ only rejected Dr. Ziyar's opinion that Plaintiff was incapable of work.

21  AR 17; 359.  The ALJ gave no reasons for rejecting Dr. Ziyar's opinion of Plaintiff 's non-

22  exertional limitations.  Dr. Ziyar is a treating medical source.  The opinions of treating doctors

23  should be given more weight than the opinions of doctors who do not treat the claimant.  *Reddick*

24  *v. Chater*, 157 F.3d 715, 725 (9th Cir.1998); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.1995).

25  Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only

26  for "clear and convincing" reasons supported by substantial evidence in the record.  *Lester*, 81

27  F.3d at 830.  Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may

28  not reject this opinion without providing "specific and legitimate reasons" supported by

substantial evidence in the record.  *Id.* (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th

Cir.1983)).  This can be done by setting out a detailed and thorough summary of the facts and

conflicting clinical evidence, stating his interpretation thereof, and making findings.  *Magallanes*

*v. Bowen*, 881 F.2d 747, 751 (9th Cir.1989).  The ALJ must do more than offer his conclusions.

He must set forth his own interpretations and explain why they, rather than the doctors', are

correct.  *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir.1988).  Therefore, a treating

physician's opinion must be given controlling weight if it is well-supported and not inconsistent

with the other substantial evidence in the record.  *Lingenfelter v. Astrue*, 504 F.3d 1028 (9th Cir.

2007).

        In *Orn v. Astrue,* 495 F.3d 625 (9th Cir. 2007), the Ninth Circuit reiterated and

expounded upon its position regarding the ALJ's acceptance of the opinion an examining

physician over that of a treating physician.  "When an examining physician relies on the same

clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions

of the examining physician are not '"substantial evidence."'  *Orn,* 495 F.3d at 632; *Murray*, 722

F.2d at 501-502.  "By contrast, when an examining physician provides 'independent clinical

findings that differ from the findings of the treating physician' such findings are 'substantial

evidence.'"  *Orn*, 496 F.3d at 632; *Miller v. Heckler*, 770 F.2d 845, 849 (9th Cir.1985).

Independent clinical findings can be either (1) diagnoses that differ from those offered by another

physician and that are supported by substantial evidence, *see Allen v. Heckler*, 749 F.2d 577, 579

(9th Cir.1985), or (2) findings based on objective medical tests that the treating physician has not

herself considered, *see Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995).

        If a treating physician's opinion is not giving controlling weight because it is not well

supported or because it is inconsistent with other substantial evidence in the record, the ALJ is

instructed by Section 404.1527(d)(2) to consider the factors listed in Section 404.1527(d)(2)-(6)

in determining what weight to accord the opinion of the treating physician.  Those factors include

the "[l]ength of the treatment relationship and the frequency of examination" by the treating

physician; and the "nature and extent of the treatment relationship" between the patient and the

treating physician.  20 C.F.R. 404.1527(d)(2)(i)-(ii).  Other factors include the supportablility of

the opinion, consistency with the record as a whole, the specialization of the physician, and the extent to which the physician is familiar with disability programs and evidentiary requirements. 20 C.F.R. § 404.1527(d)(3)-(6).   Even when contradicted by an opinion of an examining physician that constitutes substantial evidence, the treating physician's opinion is "still entitled to deference."  SSR 96-2p; *Orn*, 495 F.3d at 632-633.  "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."  SSR 96-2p; *Orn*, 495 F.3d at 633.

Here, the ALJ did not offer any reasons that meet either the "clear and convincing" standard, or the "specific and legitimate" standard.  Thus, the ALJ's failure to consider Plaintiff's non-exertional limitations, as espoused by Plaintiff's treating psychiatrist, constitutes reversible error.

Additionally, Dr. Hood, the state agency psychiatrist found that Plaintiff was moderately limited in his abilities to understand and remember detailed instructions, carry out detailed instructions, interact appropriately with the general public, and accept instructions and respond appropriately to criticism from supervisors.  AR 275-276.  Of these four limitations, the ALJ included only one which was Plaintiff's ability to interact appropriately with the general public, in his RFC.  AR 14.  The ALJ gave no reasons for failing to include the other three limitations in his RFC.  The ALJ did state that "little weight is given to the State agency medical consultant's mental assessments" of the Plaintiff, but his reasoning was because "it fails to address [Plaintiff's] anxiety disorder."  This is an insufficient basis on which to reject a consulting physician's opinion about non-exertional limitations.  "The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."  SSR 96-8p.  In addition, "Administrative law judges and the Appeals Council are not bound by findings made by State agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions."  SSR 96-6p. Furthermore, the opinions of non-treating physicians are substantial evidence where they are supported by clinical findings and objective tests. *See Magallanes v. Bowen*, 881 F.2d 747, 751

1   (9th Cir. 1989).  The state agency mental RFC assessment is consistent with Plaintiff's history of
2   depression, anxiety, and bipolar disorder, the opinion of treating psychiatrist Dr. Ziyar, and the
3   opinion of examining psychiatrist Dr. Michiel.  The ALJ should have either included the
4   additional non-exertional limitations found by the state agency psychiatrist in his RFC, or explain
5   why they were rejected.

6       In the physical RFC assessment, the state agency medical consultant opined that Plaintiff
7   was limited in his ability to reach.  AR 261.  The ALJ gave "substantial weight" to the state
8   agency opinion because it was "more consistent with other medical records."  AR 18.
9   Nevertheless, this non-exertional limitation was excluded from the RFC.  AR 14.  This
10  additionally constitutes reversible error.  Non-exertional impairments-including postural and
11  manipulative limitations such as difficulty reaching, handling, stooping, climbing, crawling, or
12  crouching-may, if sufficiently severe, limit a claimant's functional capacity in ways not
13  contemplated by the grids. 20 C.F.R. § 404.1569; *Tackett,* 180 F.3d at 1101-02 ( *quoting*
14  *Desrosiers v. Sec'y of Health & Human Servs.,* 846 F.2d 573, 577 (9th Cir.1988) (Pregerson, J.,
15  concurring)).  Here, the severity of Plaintiff's reaching limitation and its effect on the
16  occupational base of unskilled work is unclear.  The ALJ should have included this limitation in
17  the RFC or explained why it was not included, in light of his weighting of the state agency
18  opinion.

19      In sum, the ALJ committed reversible error in failing to discuss and explain how the non-
20  exertional limitations were considered.  Given this lack of analysis, the court is unpersuaded by
21  Defendant's argument that Plaintiff's non-exertional limitations had little or no effect on the
22  occupational base of unskilled light work.  Moreover, the Court cannot determine whether the
23  medical-vocational guidelines were properly applied.   Based on the above, the Court will
24  remand the case so that the ALJ can adequately address all of the doctors' opinions as outlined
25  above.  After doing so, the ALJ shall make a determination whether the grids are still applicable.
26  Furthermore, the court notes that Plaintiff's last psychological examination occurred over two
27  years ago.  On remand, the ALJ should consider obtaining an updated psychological examination
28  to determine the current status of Plaintiff's psychological condition.

1    **REMAND**

2         Section 405(g) of Title 42 of the United States Code provides: "the court shall have the

3    power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying,

4    or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."

5    In social security cases, the decision to remand to the Commissioner for further proceedings or

6    simply to award benefits is within the discretion of the court. *McAllister v. Sullivan*, 888 F.2d

7    599, 603 (9th Cir. 1989). "If additional proceedings can remedy defects in the original

8    administrative proceedings, a social security case should be remanded. Where, however, a

9    rehearing would simply delay receipt of benefits, reversal and an award of benefits is

10   appropriate." *Id.* (citation omitted); *see also Varney v. Secretary of Health & Human Serv.*, 859

11   F.2d 1396, 1399 (9th Cir.1988) ("Generally, we direct the award of benefits in cases where no

12   useful purpose would be served by further administrative proceedings, or where the record has

13   been thoroughly developed.").

14        Here, the Court finds that remand for further proceedings is proper to allow the ALJ to

15   properly review all of the medical and psychological evidence as outlined above.

16   **CONCLUSION**

17        Based on the foregoing, the Court finds that the ALJ's decision is not supported by

18   substantial evidence and is therefore REVERSED and the case is REMANDED to the ALJ for

19   further proceedings consistent with this opinion. The Clerk of this Court is DIRECTED to enter

20   judgment in favor of David M. Lawrence and against Defendant Michael J. Astrue,

21   Commissioner of Social Security.

22

23        IT IS SO ORDERED.

24   **Dated:   August 27, 2010**          **/s/ Gary S. Austin**

25                                         UNITED STATES MAGISTRATE JUDGE

26

27

28